1  GAUTAM DUTTA, ESQ. (State Bar # 199326)
   NEW AMERICA FOUNDATION
2  3435 Wilshire Blvd., Suite 2724
   Los Angeles, CA  90010
3  Telephone:  213-480-0994
   Facsimile:  213-480-0994
4  Email:  dutta@newamerica.net

5  Attorney for *amicus curiae*
   New America Foundation
6

7

8              UNITED STATES DISTRICT COURT

9            NORTHERN DISTRICT OF CALIFORNIA

10

11 RON DUDUM, MATTHEW SHERIDAN,          CASE NO.  10-CV-00504 SI
   ELIZABETH MURPHY, KATHERINE
12 WEBSTER, MARINA FRANCO and           **NEW AMERICA FOUNDATION'S BRIEF
   DENNIS FLYNN,                        AS AMICUS CURIAE IN OPPOSITION TO
13                                       PLAINTIFFS' MOTION FOR
              *Plaintiffs*,              PRELIMINARY INJUNCTION**
14
         vs.                            HEARING DATE:  March 12, 2010
15                                       HEARING TIME:  9:00 A.M.
   JOHN ARNTZ, Director of Elections of  JUDGE:  Hon. Susan Ilston
16 the City and County of San Francisco; the  COURTROOM:  10
   CITY & COUNTY OF SAN
17 FRANCISCO, a municipal corporation; the  [Declaration of Richard E. DeLeon; Declaration
   SAN FRANCISCO DEPARTMENT OF          of Steven Hill, Declaration of Gautam Dutta,
18 ELECTIONS; the SAN FRANCISCO          and Request for Judicial Notice filed
   ELECTIONS COMMISSION; and DOES       concurrently herewith]
19 1-20,

20            *Defendants*.

21

22

23

24

25

26

27

28

1

**TABLE OF CONTENTS**

2

**Page**

3    MEMORANDUM OF POINTS AND AUTHORITIES ................................................ 2

4        I.     Introduction ................................................................................ 2

5        II.    Factual Background ................................................................... 3

6        III.   IRV's Constitutionality Is Beyond Doubt .............................. 6

7             A.    Standard of Review ................................................ 8

8             B.    IRV Does Not Trigger Any Heightened Scrutiny ...................... 9

9        IV.   A Litany of Concocted Constitutional Rights ....................... 11

10            A.    IRV and Majority Winners .................................. 11

11            B.    No Constitutional "Right" To a Two-Person Runoff Election ................. 16

12       V.    Plaintiffs' Fatally Flawed Report ........................................ 18

13       VI.   Legitimate Interests Support the Use of Three-Choice IRV ................. 20

14       VII.  Conclusion .......................................................................... 22

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

## CASES

*Anderson v. Celebrezze,*
  460 U.S. 780 (1983) ................................................................... 7, 18

*Ayers-Schaffner v. Distefano,*
  37 F.3d 726 (1st Cir. 1994) ....................................................... 15

*Burdick v. Takushi,*
  504 U.S. 428 (1992) ................................................... 7, 17, 18, 19

*Bush v. Gore,*
  531 U.S. 98 (2000) .................................................................. 7, 8, 9

*Crawford v. Marion County Election Bd.,*
  128 S.Ct. 1610 (2008) ............................................................... 7, 17

*Edelstein v. San Francisco,*
  56 P.3rd 1020 (Cal. 1992) ................................................ 6, 9, 10, 18

*Holder v. Hall,*
  512 U.S. 874 (1994) ...................................................................... 5

*McSweeney v. City of Cambridge,*
  665 N.E.2d 11 (Mass 1996) ................................................. passim

*Minn. Voters Alliance v. City of Minneapolis,*
  766 N.W.2d 683 (Minn. 2009) ............................................. passim

*Moore v. Election Comm'rs of Cambridge,*
  309 Mass. 303, 35 N.E.2d 222 (Mass 1941) ........................... 1, 5, 18

*Partnoy v. Shelley,*
  277 F.Supp.2d 1064 (S.D.Cal. 2003) ..................................... 15

*Reynolds v. Sims,*
  377 U.S. 533 (1964) ................................................................... 7, 8

*Stephenson v. Ann Arbor Bd. of Canvassers,*
  No. 75-10166 AW (Mich. Cir. Ct. Nov. 1975) ....................... 6

*United States v. Salerno,*
  481 U.S. 739 (1987) ...................................................................... 5

*Wash. State Grange v. Wash. Republican Party,*
  128 S.Ct. 1184, 1190 (2008) ................................................... 6, 7

*Williams v. Rhodes,*
  393 U.S. 23 (1968) ........................................................................ 5

## STATUTES

San Francisco Charter § 13.102 ......................................................... 5, 18

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.      Introduction

*If you can't beat them, sue them.*  That might as well be the motto of Plaintiffs, led by a perennial losing candidate (Ron Dudum) who mistakenly blames Instant Runoff Voting for his lack of success.[1]

Plaintiffs' specious lawsuit challenges a proven voting system that has been used by the City and County of San Francisco ("San Francisco") for six straight elections.  Although Plaintiffs profess to bring this lawsuit on behalf of the public interest, their case can be summed up in two words:  sour grapes.

Plaintiffs rush to this Court with a farfetched premise:  that, somehow, San Francisco's Instant Runoff Voting ("IRV") system disenfranchises voters, because its current voting equipment does not allow voters to rank more than three choices.  According to Plaintiffs, this three-choice limit has caused ballots to become "exhausted" before the final round of counting – and purportedly deprived voters of the "right" to participate in a head-to-head runoff between the final two finishers.  However, Plaintiffs' flawed, error-infested analysis utterly fails to show that three-choice IRV has altered the outcome of <u>any</u> election.

It is astounding that Plaintiffs even filed this lawsuit – especially since the Massachusetts Supreme Court has <u>already</u> rejected a virtually identical claim.[2]  In a seminal 1996 case involving an as-applied challenge, the justices unanimously upheld an IRV system's constitutionality, <u>even</u>

---

[1]      "Three-Candidate Limit in SF Voting System Unconstitutional, Suit Says," Courthouse News Service, Feb. 8, 2010 ("[Plaintiff] <u>Dudum attributes his loss to the [IRV] voting system</u>[.]") (emphases added), RJN Ex. 1, <u>available at</u> http://www.courthousenews.com/2010/02/08/24499.htm (last visited Feb. 25, 2010).

[2]      <u>McSweeney v. City of Cambridge</u>, 665 N.E.2d 11, 13-15 (Mass. 1996).  Tellingly, Plaintiffs' Moving Papers confine <u>McSweeney</u> to a fleeting footnote.  Plaintiffs' Moving Papers 13 n.8.  Contrary to Plaintiffs' obfuscations, the Massachusetts Supreme Court has <u>twice</u> upheld the constitutionality of Cambridge's IRV system, in 1941 and 1996.  <u>McSweeney</u>, 665 N.E.2d 11 (upholding Cambridge's IRV system against an as-applied challenge in 1996); <u>Moore v. Election Comm'rs of Cambridge</u>, 309 Mass. 303, 331, 35 N.E.2d 222 (Mass. 1941) (upholding Cambridge's IRV system in 1941); <u>cf.</u> Plaintiffs' Moving Papers 13 n.8.

where some ballots had become "exhausted" (*McSweeney v. City of Cambridge*).[3]  Furthermore,

last year the Minnesota Supreme Court unanimously upheld the constitutionality of Minneapolis'

three-choice[4] IRV – the exact form of IRV that Plaintiffs now challenge (*Minnesota Voters*

*Alliance*).[5]

## II.   Factual Background

In order to understand why 55 percent of San Francisco voters approved IRV in 2002, it is

important to place IRV in the context of other voting methods and to compare it with two-round

runoff elections (which San Francisco used before 2004).[6]

Before IRV was adopted, candidates for San Francisco offices competed in a first-round

election in November.[7]  If a candidate won a majority of ballots cast (50 percent plus 1), that

candidate was elected.[8]  If no candidate won a majority of votes at the November general

election, the top two votegetters faced off in a separate December runoff election.[9]  Very often,

voter turnout for the December runoff elections dropped precipitously from November.  For

example, in 2000, voter turnout for the November general election was 66 percent.[10]  By contrast,

voter turnout for the subsequent December runoff election was 33 percent – a 50 percent drop in

---

[3]      McSweeney, 665 N.E.2d at 13-15.

[4]      Sample Minneapolis Ballot, RJN Ex. 2, available at
http://minnesota.publicradio.org/features/2009/05/IRV_Ballots.pdf (last visited Feb. 25, 2010).

[5]      Minn. Voters Alliance v. City of Minneapolis, 766 N.W.2d 683 (Minn. 2009) ("Voters
Alliance").  Tellingly, the Voters Alliance plaintiffs did not even try to claim that three-choice
IRV was unconstitutional.

[6]      "San Francisco Successfully Uses Ranked Choice Voting for Citywide Elections," Nov.
2005, available at http://www.sfrcv.com/ (last visited Feb. 26, 2010); Joint FairVote/New
America Study, "How IRV Boosts Voter Turnout", RJN Ex. 3, available at
http://irvinla.org/latest_news/how-irv-boosts-voter-turnout (last visited Feb. 25, 2010).

[7]      Id.

[8]      Id.

[9]      Id.

[10]     Id.

NEW AMERICA FOUNDATION'S BRIEF
AS AMICUS CURIAE
10-CV-00504-SI

voter participation.[11]

This race was not unusual:  voter turnout for the December runoff elections was typically low and even more so in San Francisco's most socio-economically diverse neighborhoods.[12]

Most elections in the United States, including elections for state legislatures, the White House, Congress and governors' offices, are plurality elections – where the highest votegetter wins, even if he or she does not win a majority.[13]  In races with multiple candidates, winning candidates often win elected office with less than a majority of votes cast.[14]  For these races, this means that a majority of voters have cast their ballots for <u>losing</u> candidates.  While the most obvious example of this phenomenon occurred in the 2000 Presidential election, the winner of the 1992 and 1996 presidential elections also won office with a plurality of votes cast.[15]

Any voting method produces what are known as "effective" votes, votes which ultimately elect a candidate, and "wasted" votes, which are ballots cast for losing candidates.[16]  Plurality elections produce the most "wasted" (ineffective) votes of all election methods.[17]  Just weeks ago, the Republican gubernatorial primary in Illinois was won by a candidate with barely 20 percent of

---

[11]     <u>Id.</u>

[12]     "Instant Runoff Voting and Its Impact on Racial Minorities", New America Foundation & FairVote, June 2008, RJN Ex.4, <u>available at</u> <u>http://irvinla.org/sites/irvinla.org/files/IRV%20and%20race%20memo-FINAL.pdf</u> (last visited Feb. 25, 2010).  High-profile mayoral elections which resulted in December runoffs were the only exception to this rule (e.g., Dec. 2003 mayoral runoff election between Gavin Newsom and Matt Gonzalez).  "Historical Voter Turnout", San Francisco Department of Elections website, <u>available at</u> <u>http://www.sfgov.org/site/elections_index.asp?id=61511</u> (last visited Feb. 25, 2010).

[13]     Decl. of Richard E. DeLeon ¶ 12, Feb. 26, 2010.  ("DeLeon Decl.")

[14]     <u>Id.</u>

[15]     Bill Clinton won with 43 percent and 49 percent in 1992 and 1996, respectively; George W. Bush won with 48 percent in 2000.  David Leip, ATLAS OF U.S. PRESIDENTIAL ELECTIONS, 2008 PRESIDENTIAL GENERAL ELECTION RESULTS (2005), <u>available at</u> http://uselectionatlas.org/RESULTS (last visited Feb. 20, 2010).

[16]     DeLeon Decl. ¶ 12.

[17]     <u>Id.</u>

the vote, meaning that approximately 80 percent of voters cast "wasted" ballots.[18]  This is how most elections in the United States are conducted.  In essence, two-round runoff elections consist of two back-to-back plurality elections.[19]

Plurality elections limit voters to just one ranking.  Voters in San Francisco's Instant Runoff Voting elections may rank three candidates—or three times as many as the choices provided in a typical plurality election.

Three-choice IRV is superior to one-choice plurality elections for a number of reasons. Instant Runoff Voting provides voters with more choices, increases every voter's chance of casting an effective ballot, increases the total number of effective ballots cast in any given election, and enables elections to be held when voter turnout tends to be highest.[20]  Equally important, IRV has increased voter turnout for San Francisco's decisive elections and has maximized voter participation, especially in the city's most socio-economically diverse neighborhoods.[21]

Successfully used in a number of cities and countries (including the United Kingdom, Ireland, and Australia) across the globe, IRV has been used in San Francisco since 2004.[22]  This November, the cities of Oakland, Berkeley, and San Leandro will implement IRV for their

---

[18]     "Illinois Gubernatorial Election, 2010", Wikipedia, RJN Ex. 6, available at http://en.wikipedia/org/wiki/Illinois_gubernatorial_election,_2010 (last visited Feb. 25, 2010).

[19]     Although the runoff election seeks to produce a majority winner between the two leading candidates, write-in candidates and blank ballots (undervotes) could deprive the winning candidate of an absolute majority.  DeLeon Decl. ¶ 12 n.1.

[20]     DeLeon Decl. ¶ 11.

[21]     "Instant Runoff Voting and Its Impact on Racial Minorities" p.2, New America Foundation & FairVote, June 2008, RJN Ex. 4, available at http://irvinla.org/sites/irvinla.org/files/IRV%20and%20race%20memo-FINAL.pdf (last visited Feb. 24, 2010).

[22]     "New America Foundation Commends Berkeley for Support of Instant Runoff Voting," Feb. 10, 2010, RJN Ex. 5, available at http://politicalreform.newamerica.net/pressroom/2010/new_america_foundation_commends_berkeley_for_support_of_instant_runoff_voting (last visited Feb. 25, 2010).

municipal elections.[23]  Last week, two prominent lawmakers introduced legislation to enable California counties to use IRV to fill congressional and state legislative vacancies.[24]

Although Plaintiffs claim they are only challenging three-choice IRV, Plaintiffs are really seeking to repeal[25] IRV – and thereby repudiate the will of San Francisco voters.  In so doing, Plaintiffs seek to burden voters with inferior plurality elections that will reduce voter participation, shrink voter choices, and decrease the number of voters who cast effective ballots.  Yet, as we will show, Plaintiffs fail to provide any legal or factual support for their extraordinary allegations.

## III.   IRV's Constitutionality Is Beyond Doubt

The constitutionality of Instant Runoff Voting systems is beyond doubt.  Since 1941, two state supreme courts and a Michigan court have repeatedly upheld the constitutionality of IRV systems against both facial and as-applied challenges.[26]  Indeed, three U.S. Supreme Court justices have approvingly mentioned IRV systems.[27]  Furthermore, the U.S. Department of Justice

---

[23]   Id.

[24]   "Sen. Hancock & Asm. Eng Introduce IRV Special Election Bills", New America Foundation press release, Feb. 23, 2010, RJN Ex. 7, available at http://politicalreform.newamerica.net/pressroom/2010/senator_hancock_and_assemblymember_eng_introduce_sb_1346_and_ab_2732

[25]   "Three-Candidate Limit in SF Voting System Unconstitutional, Suit Says," Courthouse News Service, Feb. 8, 2010  ("Plaintiff Ron Dudum … says the [IRV] system is confusing to voters no matter how many times it's explained.").  RJN Ex. 1, available at http://www.courthousenews.com/2010/02/08/24499.htm (last visited Feb. 25, 2010).  In their Moving Papers, Plaintiffs in effect make San Francisco a settlement offer of "return[ing] to a traditional [two-round] runoff system like that used in the years prior to the adoption of [IRV]".  Plaintiffs' Moving Papers 21:11-21:14 (emphases added).

[26]   See, e.g., Voters Alliance, 766 N.W.2d 683 (Minn. 2009) (facial constitutional challenge); McSweeney, 665 N.E.2d 11 (as-applied constitutional challenge) (re-aff'g Moore, 309 Mass. 303, 35 N.E.2d 222) (Cambridge's multiple-seat form of IRV is known as "Plan E"); see also Stephenson v. Ann Arbor Bd. of Canvassers, No. 75-10166 AW (Mich. Cir. Ct. Nov. 1975) (as-applied constitutional challenge) (cited by Voters Alliance, 766 N.W.2d at 690), RJN, Ex. 8, available at http://archive.fairvote.org/?page=397 (last visited Feb. 20, 2010).

In 1941, Cambridge, Massachusetts first began using a multiple-seat (proportional representation) form of IRV ("Plan E") for its municipal elections.  See Moore, 35 N.E.2d 222.

[27]   See, e.g., Holder v. Hall, 512 U.S. 874, 910 (1994)) (Thomas, J.; Scalia, J., concurring)

has implicitly acknowledged the constitutionality of the multiple-seat form of IRV, when it denied federal Voting Rights Act pre-clearance to New York City's 1999 attempt to eliminate multiple-seat IRV.[28]

In 2002, voters adopted IRV by approving an amendment to the San Francisco Charter.[29] While that amendment required that voters be permitted to rank as many candidates as they wished, it carved out one important exception:

> [I]f the voting system, vote tabulation system or similar or related equipment used by [San Francisco] <u>cannot feasibly accommodate choices equal to the total number of candidates running</u> for each office, then the Director of Elections <u>may limit the number of choices a voter may rank to no fewer than three</u>.[30]

At the time San Francisco implemented IRV, its existing voting equipment could not "feasibly accommodate" more than three IRV choices.[31]  Significantly, that voting equipment offered two valuable benefits: (1) it gave voters the chance to correct errors in their first-choice

_____

(citing with approval "transferable votes" [i.e., choice voting, the multiple-seat form of IRV] as a remedy for violations of § 2 of the Voting Rights Act); <u>Williams v. Rhodes</u>, 393 U.S. 23, 47 n.8 (1968) (Harlan, J., concurring) ("Alternatively, the voter could be given the right, at the general election, to indicate both his first and his second choice for the Presidency – if no candidate received a majority of first-choice votes, the second-choice votes could then be considered.").

[28]    Robert Richie, Douglas Amy, Frederick McBride, "How Proportional Representation Can Empower Minorities and the Poor," Nov. 2000, RJN Ex. 9, p. 3 of 5, <u>available at</u> <u>http://www.mtholyoke.edu/acad/polit/damy/articles/empower.htm</u> (last visited Feb. 24, 2010) ("Also in 1999, the DOJ denied pre-clearance to New York City after the legislature voted to replace choice voting [i.e., multiple-seat IRV] (a fully proportional voting system) with limited voting (a less proportional system) for electing the city's local school boards; choice voting had elected a significantly higher percentage of racial minorities to school boards than had been elected to other legislative bodies in the city.").  Subsequently, New York City disbanded its elected school board for unrelated reasons.  DeLeon Decl. ¶ 24; "The Brief Life and Impending Death of a Board of Education," N.Y. TIMES, Aug. 8, 2009, <u>available at</u> <u>http://www.nytimes.com/2009/08/08/education/08board.html</u> (last visited Feb. 25, 2010).

[29]    S.F. CHARTER § 13.102 (2002), RJN Ex. 12, <u>available at</u> <u>http://library.municode.com/index.aspx?clientId=14130&stateId=5&stateName=California</u> (last visited Feb. 25, 2010).

[30]    <u>Id.</u> § 13.102(b) (emphases added).

[31]    Decl. of Steven Hill ("Hill Decl.") ¶ 5.

IRV rankings at the polling station, and (2) it made it possible for San Francisco to report election-night results for the voters' first-choice IRV rankings.[32]  Ironically, Plaintiffs now claim that those very safeguards constitute a constitutional violation.

### A.     Standard of Review

Plantiffs' entire case turns on only one issue:  whether three-choice IRV imposes a "severe" burden on the right to vote.[33]  As this brief will show, three-choice IRV does not impose any such burden.  In fact, IRV strengthens every voter's right and ability to vote for candidates of his or her choice.

As the Minnesota high court noted in *Voters Alliance,* the U.S. Supreme Court has laid down two touchstones for examining election laws:  (1) States (and local governments,[34] to the extent permitted by the states) "have authority to establish their own election processes,"[35] and (2) election regulations may "impose some level of restrictions on the right to vote and the concomitant right to political association."[36]  If strict scrutiny is not triggered, a court need only examine whether any "important regulatory interests" can justify a given election regulation.[37]

Significantly, strict scrutiny <u>cannot</u> be invoked, unless a government imposes a "severe" burden on the right to vote.[38]  As a matter of law, a voting regulation that imposes some burden or

---

[32]     San Francisco's current IRV voting equipment also affords these significant benefits.  <u>Id.</u> ¶ 6.

[33]     <u>Wash. State Grange v. Wash. Republican Party</u>, 128 S.Ct. 1184, 1190-91 (2008).

[34]     Charter cities may adopt Instant Runoff Voting for their elections, pursuant to the authority accorded to charter cities and counties by the California Constitution.  CAL. CONST. art. XI, § 5(b); <u>see also</u> <u>Edelstein v. San Francisco</u>, 29 Cal. 4th 164, 173, 56 P.3rd 1020 (Cal. 1992).

[35]     <u>Voters Alliance</u>, 766 N.W.2d at 689 (<u>citing</u> <u>Wash. State Grange</u>, 128 S.Ct. at 1190); <u>see also</u> <u>United States v. Salerno</u>, 481 U.S. 739, 745 (1987).

[36]     <u>Voters Alliance</u>, 766 N.W.2d at 689 (emphases added) (<u>citing</u> <u>Anderson v. Celebrezze</u>, 460 U.S. 780, 788 (1983).

[37]     <u>Anderson</u>, 460 U.S. at 788 (<u>quoted by</u> <u>Voters Alliance</u>, 766 N.W.2d at 696-97).

[38]     <u>Wash. State Grange</u>, 128 S.Ct. at 1190; <u>Crawford</u>, 128 S.Ct. at 1622-23; <u>Burdick v. Takushi</u>, 504 U.S. 428, 433-34 (1992); <u>see also</u> <u>Voters Alliance</u>, 766 N.W.2d at 689.

affects a limited number of voters will <u>not</u> trigger strict scrutiny; because such a regulation would not impose a "severe" burden.[39]  We will now apply these precepts to three-choice IRV.

### B.    IRV Does Not Trigger <u>Any</u> Heightened Scrutiny

Tellingly, both the Massachusetts and Minnesota Supreme Courts have refused to apply <u>any</u> heightened scrutiny for constitutional challenges against IRV (in *McSweeney* and *Voters Alliance*, respectively).[40]  In *McSweeney*, the Massachusetts high court not only refused to apply strict scrutiny to an as-applied challenge, but emphatically rejected the notion that IRV "derogates from the fundamental right to vote or denies each citizen the right to have his or her vote counted equally."[41]

Furthermore, in *Voters Alliance*, the Minnesota high court – which upheld the use of Minneapolis' <u>three-choice IRV</u> – rejected the notion that IRV violates the Equal Protection Clause under either *Reynolds v. Sims*[42] or *Bush v. Gore*:[43]

> In addition to arguing that IRV violates the rights to vote and to political association, appellants argue it violates their right to equal protection. This claim appears to be based primarily on the arguments about unequal weighting of votes, and as we have seen, <u>there is no unequal weighting in the IRV system for single-seat races or in multiple-seat races</u>[.]. Appellants' equal protection claim fails as well because it is not supported by the legal authority on which it is premised, specifically, the Supreme Court's one-person, one-vote jurisprudence and <u>Bush v.</u>

---

[39]    <u>Burdick</u>, 504 U.S. at 433-34; <u>Crawford v. Marion County Election Bd.</u>, 128 S.Ct. 1610, 1622-23 (2008); <u>see also</u> <u>Voters Alliance</u>, 766 N.W.2d at 689.

[40]    <u>Voters Alliance</u>, 766 N.W.2d at 696-97 (<u>citing</u> <u>Wash. State Grange v. Wash. Republican Party</u>, 128 S.Ct. 1184, 1190-91 (2008); <u>Crawford</u>, 128 S.Ct. at 1622-23; <u>Anderson</u>, 460 U.S. at 788); <u>accord</u>, <u>McSweeney</u>, 665 N.E.2d at 14-15.

[41]    <u>Id.</u> at 13-15.

[42]    377 U.S. 533 (1964).

[43]    531 U.S. 98 (2000).

1

*Gore*, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000) (per curiam).

2

Although the Court's one-person, one-vote cases do address the general

3

issue of unequal weighting of votes, they are inapposite here. The one-person, one-

4

vote cases had their origin in the malapportionment of legislatures. See *Reynolds*

5

*v. Sims*, 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). That is, the number

6

of voters in some districts electing one legislator was several multiples higher than

7

in other districts, meaning that a vote in the smaller population district had more

8

impact in terms of electing a legislator than a vote in the more populous district.

9

See id. at 562-63, 84 S.Ct. 1362. No such vote inequality is created by IRV.

10

In addition, appellants contend that, under IRV, some votes are counted

11

differently than others, and the system therefore violates the equal protection

12

principles articulated in Bush. We agree with the district court that Bush is not

13

controlling here. The essence of the equal protection problem addressed in Bush

14

was that because there were no established standards under Florida law for

15

discerning voter intent, in the recount process ballots were being judged differently

16

from county to county, and even within individual counties. See Bush, 531 U.S. at

17

106, 121 S.Ct. 525. In contrast, in the IRV system, *every* ballot and every vote is

18

counted by the same rules and standards.[44]

19

20

Predictably, Plaintiffs will try to escape the on-point holdings of *McSweeney* (Mass.

21

Supreme Court)[45] and *Voters Alliance* (Minn. Supreme Court).[46]  First, they will seek to

22

distinguish *Voters Alliance* on two grounds:  (1) *Voters Alliance* dealt with only a facial

23

24

25

---

26

[44]     *Voters Alliance*, 766 N.W.2d at 698 (citing *Reynolds v. Sims*, 377 U.S. 533, 562-63 (1964); Bush v. Gore, 531 U.S. 98, 106 (2000) (per curiam)).

27

[45]     *McSweeney*, 665 N.E.2d 11.

28

[46]     *Voters Alliance*, 766 N.W.2d 683.

1  constitutional challenge, while Plaintiffs have brought both a facial and an as-applied challenge,

2  (2) *Voters Alliance* did not rule on whether a government could limit voters to a maximum of

3  three IRV choices.[47]  Neither excuse suffices.  While it did not specifically address the issue of

4  how many IRV choices must be offered to voters, *Voters Alliance* offers persuasive authority on

5  both facial and as-applied challenges with regard to <u>any</u> IRV system.

6

7         Since *McSweeney* rejected their legal theory, Plaintiffs will try their utmost to convince

8  this Court not to rely on that Massachusetts high court decision.  Toward that end, Plaintiffs may

9  parrot their consultant's incorrect claim:  that Cambridge, Massachusetts allows voters to rank

10 "unlimited" choices.[48]  Yet, like San Francisco, Cambridge also limits the number of candidates

11 that voters may rank in its multiple-seat form of IRV.[49]  Plaintiffs ignore the inescapable import

12 of *McSweeney* and *Voters Alliance* at their peril.[50]

13

14 **IV.    A Litany of Concocted Constitutional Rights**

15        In seeking to re-litigate *McSweeney* and *Voters Alliance*, Plaintiffs have in effect claimed

16 that three-choice IRV imposes a "severe" burden on two constitutional "rights":

17              1.      The "right" to elect a majority winner

18              2.      The "right" to participate in a two-person runoff election

19

20 **A.      IRV and Majority Winners**

21        Plaintiffs first quibble that IRV "has repeatedly resulted in the election of candidates who

22

23

---

24 [47]    <u>Cf.</u> Plaintiffs' Moving Papers 13 n.8.

    [48]    <u>Id.</u>; Plantiffs' Decl. of Dr. Jonathan Katz ¶ 14.  Contrary to Plaintiffs' consultant's
25 Declaration, Cambridge does not have unlimited-choice IRV.  For instance, the city restricts
   voters to 10 IRV choices for its six-person school board elections. Cambridge sample ballot, RJN
26 Ex. 10, <u>available at</u> http://archive.fairvote.org/media/irv/2001school.pdf (last visited Feb. 25,
   2010).

27 [49]    <u>Id.</u>

   [50]    <u>Cf.</u> Plaintiffs' Moving Papers 13 n.8.
28

gathered less than a majority[.]"[51]  While their claims are factually flawed, there is no
constitutional right to elect a majority winner.  Indeed, the U.S. Constitution does not require that
the President be elected with a majority – or even a plurality[52] – of the popular vote.[53]
Remarkably, three of the past six Presidential elections were not won by a majority winner:  Bill
Clinton (1992, 1996) and George W. Bush (2000).[54]

Currently, the most widely used electoral method in California is the plurality system,
where the top votegetter wins, even if he or she has not won a majority of the vote. In 2003,
Arnold Schwarzenegger was elected California Governor without receiving a majority.[55]

Unlike plurality systems, San Francisco's IRV system ensures that voters have the
opportunity to elect a majority winner – a vast improvement over the nation's predominant,
plurality election system.  Significantly, before it adopted IRV, San Francisco had used a
plurality-based, two-person runoff system.  That is, if no one won a majority in the November
first-round election, the top two votegetters would advance to a December runoff election.

Ironically, Plaintiff Ron Dudum's pre-IRV campaign for San Francisco Supervisor
spotlighted a notorious drawback of the two-round runoff system:  the "top two" votegetters
might not even receive a majority mandate.  In the first-round of that November 2002 election,
the top two votegetters did not even win a majority of the vote between them:  Plaintiff Dudum
finished second with 22.9 percent of the vote, while Fiona Ma finished first with 23.6 percent of

---

[51]     Id. 8:25-8:26.

[52]     See generally Bush v. Gore, 531 U.S. 98 (2000).

[53]     U.S. CONST. art. II, § 1; see also Edelstein, 29 Cal. 4th at 183, 56 P.3rd 1020 (Cal. 2002).

[54]     Edelstein, 29 Cal. 4th at 183, 56 P.3rd 1020; "Atlas of U.S. Presidential Elections," available at http://uselectionatlas.org/RESULTS/ (last visited Feb. 25, 2010).

[55]     The 2003 recall election results, available at http://en.wikipedia.org/wiki/California_gubernatorial_recall_election,_2003#Results (Gov. Schwarzenegger received 48.6 percent of votes cast in the race to succeed Gov. Gray Davis) (last visited Feb. 25, 2010).

the vote.[56] In other words, nearly 54 percent of the voters preferred someone *other than* the top two votegetters.

Equally significant, the two-round runoff system frequently failed to produce winners with a majority mandate. During Plaintiff Dudum's unsuccessful 2002 race, voter turnout dropped nearly 20 percent between the November first-round election and the December runoff election.[57] When compared against the total number of voters who participated in November, the runoff winner (Fiona Ma) did not win a majority of the November turnout.[58]

Similarly, in 2002 San Francisco voter turnout plummeted by an average of 42.3 percent between the November 2000 first-round election and the December 2000 runoff election.[59] Again, when compared against the total number of voters who participated in November, the runoff winners received a low of 28 percent and a high of 45 percent of the November turnout – with most races in the lower end of this range.[60] All too often, two-round runoff winners fall short of winning a majority mandate.

By enabling voters to rank their choices in a single, decisive November election, IRV ensures that the winner receives broad support across all communities. In contrast to plurality or two-round runoff systems, San Francisco's three-choice IRV has tripled voters' choices in municipal elections. Consider a hypothetical election using San Francisco's previous two-round

---

56 San Francisco Department of Elections, Results Summary Nov. 2002, RJN Ex. 11, available at http://www.sfgov.org/site/elections_index.asp?id=61487 (last visited Feb. 25, 2010).

57 San Francisco Department of Elections, Results Summary Dec. 2002, RJN Ex. 13, available at http://www.sfgov.org/site/elections_index.asp?id=61485 (last visited Feb. 25, 2010).

58 Specifically, 18,078 voters participated in the Nov. 2002 first-round election. In contrast, only 14,751 participated in the Dec. 2002 runoff election (Ma received 8,289 of those votes). When she won in Dec. 2002, Ma thus received 8,289 (46 percent) of the total number of votes (18,078) that had been cast in the Nov. 2002 first-round election. RJN Ex. 11 & 13, supra notes 56 & 57.

59 Joint FairVote/New America Study, "How IRV Boosts Voter Turnout", RJN Ex. 3, available at http://irvinla.org/latest_news/how-irv-boosts-voter-turnout (last visited Feb. 25, 2010).

60 Id.

runoff system (i.e., the voting system that was used <u>before</u> voters chose to adopt IRV):

Suppose 100 voters cast ballots in a November first-round election with three candidates (A, B, C). Here are the results from this first-round election:

A:     49 votes

B:     46 votes

C:     5 votes

Since no one garnered a majority (51 votes), C is eliminated because he finished last. The contest then goes to a second-round (runoff) election between the top two finishers (A and B).

Now suppose only 70 of the original 100 voters return to a December second-round (runoff) election between A and B. (That is, voter turnout for the December election drops 30 percent.)[61]

In this runoff election, only 30 of A's original 49 voters turn out to vote; only 36 of B's 46 voters turn out; and only 4 of C's voters turn out (all of C's voters would have voted for A as a second choice). Here are the results from the December runoff election:

A:     34 votes (30 of A's 49 first-round voters, plus 4 of C's first-round voters)

B:     36 votes (36 of B's 46 first-round voters)

As a result, B wins the runoff election with a "majority" (36 votes out of 70, or 51 percent) of the vote – even though he did not receive a majority (51 votes) of the 100 votes that had been <u>originally</u> cast in the first-round election. Instead, B wins with only 36 of the 100 original, first-round votes.

---

[61]     This hypothetical actually minimizes the drop in voter turnout. In fact, San Francisco's average turnout plummeted by an average of 42.3 percent between the November 2000 first-round election and the December 2000 runoff election. <u>Id.</u>

In contrast, IRV makes it easier for voters to elect a majority winner, by allowing them to rank their top three choices in one election, not two.  Let's re-run the previous election with San Francisco's three-choice IRV:

Suppose 100 voters vote for their first, second, and third choices in a November IRV election with three candidates (A, B, C).  Here are the results from the first round of counting:

A:      49 first-choice rankings

B:      46 first-choice rankings

C:      5 first-choice rankings

Since no one garnered a majority (51 votes), C is eliminated because he finished last.

The contest then goes to an "instant runoff" between the top two finishers (A and B).  This time, all 5 of C's voters have marked A as their second choice.  Here are the results from the second round of counting:

A:      54 votes (49 of A's first-round voters, plus 5 of C's first-round voters)

B:      46 votes (all 46 of B's first-round voters)

As a result, A wins the "instant" runoff, with an <u>absolute</u> majority:  54 votes of the 100 votes that had been cast.

Unlike San Francisco's previous two-round runoff system, IRV enabled all 100 original voters to successfully choose an absolute majority winner.  In contrast to B's 36-vote "majority" in a December runoff, A wins an IRV election with an <u>absolute</u> majority of all voters:  54 effective votes out of all 100 ballots cast.

Since 2004, San Francisco's three-choice IRV system has enabled thousands of voters to

participate in the one election that counts.[62]  As a result, more votes were cast in the decisive

election, and winners received more votes (both in absolute terms and as a percentage of the vote)

than winners in December's "delayed" runoffs – and especially more than winners in

conventional plurality elections.  If Plaintiff Dudum and his fellow litigants wish to drag San

Francisco back to two-round runoffs,[63] they are free to exercise a quintessentially Californian

right:  to convince the voters to repeal IRV.

>           **B.     No Constitutional "Right" To a Two-Person Runoff Election**

At its core, Plaintiffs' Complaint boils down to one question:  Do voters have a

constitutional right to participate in a two-person runoff election?  No legal authority whatsoever

supports such an outlandish theory.

In Plaintiffs' own words, three-choice IRV allegedly violates constitutional rights,

because

> some voters are permitted to have votes cast in all rounds of the instant runoff
>
> under the instant runoff voting system, while other voters – whose ballots are
>
> "exhausted" – are deprived of the right to vote in later and dispositive rounds."[64]
>
> ****
>
> [IRV] deni[es] some voters the right to vote in later "runoff" elections based upon
>
> their failure to vote for the "right" (or most popular) candidates in earlier rounds of
>
> voting.[65]

In other words, a constitutional violation occurs every time a voter "guesses wrong" and does not

---

[62]     Joint FairVote/New America Study, "How IRV Boosts Voter Turnout," RJN Ex. 3 (available at http://irvinla.org/latest_news/how-irv-boosts-voter-turnout).

[63]     Plaintiffs' Moving Papers 21:11-14 (Plaintiffs offer San Francisco the "option" of "return[ing] to a traditional [two-round] runoff system like that used in the years prior to the adoption of Proposition A.") (emphasis added).

[64]     Compl. ¶¶ 36, 40 (emphases added).

[65]     Plaintiffs' Moving Papers 13:5-13:7 (emphases added).

vote for the "right" (i.e., most popular) candidates.

Yet much to Plaintiffs' chagrin, the Massachusetts Supreme Court has already rejected a "guessing wrong" argument nearly identical to that of Plaintiffs.  Since 1941, Cambridge has used a multiple-seat, restricted-choice form of IRV.[66]  In *McSweeney*,[67] a losing City Council candidate complained that, because some voters "guessed wrong" and did not vote for a winning candidate, IRV must have violated their constitutional rights.  Rejecting his argument, the high court unanimously held "guessing wrong" in an IRV election was no different than "guessing wrong" in a two-round runoff election:

> …[Plaintiff] is referring to those ballots that were "exhausted."  It is not correct to say that those ballots are "not counted at all." They too are read and counted; they just do not count toward the election of any of the nine successful candidates.
>
> Therefore it is no more accurate to say that these ballots are not counted than to say that the ballots designating a losing candidate in a two-person, winner-take-all race [i.e., two-person runoff election] are not counted.[68]

Simply put, there is no constitutional right against "guessing wrong" in any election system.

To be sure, supporters of third-party candidates Ross Perot (in 1992) or Ralph Nader (in 2000) would have welcomed a constitutional right to vote in a three-choice IRV election, rather

---

[66]     Contrary to Plaintiffs' consultant's Declaration, Cambridge does not have unlimited-choice IRV.  For instance, it restricts voters to 10 IRV choices for its six-person school board elections.  DeLeon Decl. ¶ 23; Cambridge sample ballot, RJN Ex. 10, available at http://archive.fairvote.org/media/irv/2001school.pdf (last visited Feb. 25, 2010); contra, Plaintiffs' Declaration of Dr. Jonathan Katz ¶ 14.

[67]     McSweeney, 665 N.E.2d at 14.

[68]     Id. at 14 (emphases added).  Since there is no constitutional right to participate in a two-person runoff election, neither Ayers-Schaffner v. Distefano nor Partnoy v. Shelley apply to this case.  Ayers-Schaffner v. Distefano, 37 F.3d 726 (1st Cir. 1994) (all voters have a constitutional right to participate in an election, irrespective of whether or not they participated in any previous election); Partnoy v. Shelley, 277 F.Supp.2d 1064 (S.D.Cal. 2003) (all voters have a constitutional right to vote on a ballot question, irrespective of whether or not they voted on a previous ballot question); contra, Plaintiffs' Moving Papers 14:9-15:12.

than the one-choice, plurality voting system that had been previously used in San Francisco. Because they were banned from ranking more than one choice, many Perot and Nader voters anguished over a "guessing game" of trying to strategically assess the influence of their votes on the ultimate outcome.  Judging by the results, thousands of them guessed badly.

## V.    Plaintiffs' Fatally Flawed Report

Undeterred by the unrelenting weight of case law, Plaintiffs disingenuously claim that three-choice IRV has distorted past election outcomes.   In a report riddled with errors, Plaintiffs' consultant Jonathan Katz sweepingly claims that three-choice IRV has

likely altered election outcomes from what would have resulted under the standard unrestricted IRV or under the traditional [two-round] runoff system.[69]

As evidence of such an "altered" outcome, Plaintiffs point to Plaintiff Dudum's 2006 failed campaign for San Francisco Supervisor.  (Significantly, Plaintiff Dudum did not receive the highest number of first-choice rankings in that race.[70]) Specifically, Plaintiffs claim that 6,010 ballots were "exhausted" and therefore not counted in the final, two-person IRV runoff between the top two finishers (Plaintiff Dudum and Ed Jew):

6,010 ballots were "exhausted" by the 4th round of the instant runoff, and no vote was counted for the voters whose ballots were "exhausted" before the 4th and final round – more than seven times the total margin of victory.[71]

The methodology behind Plaintiffs' data is fatally flawed.  As award-winning San Francisco political scientist Dr. Richard DeLeon noted,[72] Plaintiffs' consultant incorrectly added

---

[69]      Plaintiffs' Katz Decl. ¶ 2.

[70]      Winning candidate Ed Jew received 5,184 first-choice rankings, while Plaintiff Dudum received 5,134 first-choice rankings.  San Francisco Dept. of Elections, available at http://www.sfgov.org/site/elections_index.asp?id=61583 (last visited Feb. 25, 2010).

[71]      Plaintiffs' Moving Papers 8:1-8:4.

[72]      Dr. DeLeon is Professor Emeritus at San Francisco State University, where he taught

NEW AMERICA FOUNDATION'S BRIEF
AS AMICUS CURIAE
10-CV-00504-SI

the following <u>three</u> types of ballots to his category of "exhausted" ballots:[73]

       (1) "undervote" – a ballot cast in which a voter voted in one race (e.g., President), but abstained from voting in another race (e.g., San Francisco Supervisor)

       (2) "overvote" – whether in IRV or non-IRV elections, a ballot that is invalidated because a voter erroneously marked more than one candidate (e.g., a voter erroneously marks John McCain <u>and</u> Barack Obama as his or her first choice for President)

       (3) ballots in which voters chose to mark <u>fewer than 3 choices</u>.  This is analogous to not voting in the second (runoff) round of a two-round runoff election (which San Francisco used before adopting IRV).

Astoundingly, a whopping <u>86 percent</u> of Plaintiffs' purported "exhausted" ballots – 5,183 out of 6,010 – were <u>not in fact "exhausted"</u> during Plaintiff Dudum's unsuccessful 2006 race:[74]

       (a)    2,171 of the 6,010 so-called "exhausted" ballots were, in fact, from undervotes and overvotes.

       (b)    Additionally, 3,012 of the ballots did <u>not</u> contain three rankings and were "voluntarily" exhausted.  Namely, the voters <u>voluntarily</u> chose <u>not</u> to rank a second or third choice.

       (c)    In other words, <u>5,183 of the 6,010 "exhausted" ballots were not actually "exhausted."</u>  Ranking candidates is an <u>option</u>, and voters are under no obligation to use all their rankings.

_____

political science for 35 years with a focus on American government and urban politics.  He is the founder of the Public Research Institute at San Francisco State University and served as Director from 1984 to 1994.  He is the author of numerous journal articles and book chapters about urban politics and politics in San Francisco, and has conducted and reported on research specifically about IRV.  (DeLeon Decl. ¶¶ 5-8.)

[73]     <u>Id.</u> at ¶ 18.

[74]     <u>Id.</u> at ¶ 21.

1  Furthermore, Dr. DeLeon, who has studied San Francisco's elections for decades, observed that it

2  would have been a "political impossibility" for Plaintiff Dudum to have won his 2006 race:[75]

3              (d)      Due to political realities, Plaintiff Dudum would not have won his 2006

4                       election, <u>irrespective of</u> the number of "exhausted ballots".  Based on the

5                       actual[76] rankings of voters in that election, Plaintiff Dudum received

6                       insufficient support from the largest demographic voting bloc (Asian

7                       Americans) in San Francisco's 4th Supervisorial District.

8

9       Dr. DeLeon's analysis underscores one unmistakable fact:  Plaintiffs have failed to show

10  that IRV has distorted <u>any</u> election outcome.  Indeed, Plaintiffs' report is riddled with a glaring

11  number of factual errors[77] that not only strain credulity, but undermine the very foundation of

12  Plaintiffs' case.

13

14  **VI.     Legitimate Interests Support the Use of Three-Choice IRV**

15       In sum, Plaintiffs have utterly failed to show that three-choice IRV has imposed <u>any</u>

16  burden ("severe"[78] or otherwise) on the voters – and the U.S. Supreme Court would agree.  In an

17  analogous case, the high court gave wide berth to state election regulations.  In *Burdick v.*

18  *Takushi*, the high court held any election regulation that imposed "reasonable, non-discriminatory

19  restrictions" would be "presumptively valid".[79]  By allowing states to ban write-in candidates,

20

21  [75]      <u>Id.</u> at ¶ 21-22.

22  [76]      Plaintiffs' consultant incorrectly states that such data are not available.  DeLeon Decl. ¶
         19; <u>contra</u>, Plaintiffs' Katz Decl. ¶ 27.

23  [77]      Among other things, Plaintiffs' consultant inaccurately states that Aspen, Colorado (a)
24  restricts the number of rankings voters may use, and (b) "repealed" IRV in 2009.  IRV remains in
         effect in Aspen, which allows voters to use unlimited rankings.  DeLeon Decl. ¶ 25. For a
25  complete recitation of Plaintiffs' consultant's factual errors, <u>see id.</u> ¶¶ 18-26.

    [78]      <u>Burdick</u>, 504 U.S. at 433-34; <u>Crawford v. Marion County Election Bd.</u>, 128 S.Ct. 1610,
26  1622-23 (2008); <u>see also</u> <u>Voters Alliance</u>, 766 N.W.2d at 689.

27  [79]      <u>Burdick</u>, 504 U.S. at 441, 428 (quoting <u>Anderson</u>, 460 U.S. at 788); <u>see also</u> <u>Edelstein</u>, 29
         Cal. 4th at 173, 56 P.3rd 1020 (under the California Constitution, charter cities may regulate their
28  elections by barring voters from voting for write-in candidates during two-person <u>runoff</u>

NEW AMERICA FOUNDATION'S BRIEF
AS AMICUS CURIAE
10-CV-00504-SI

*Burdick* effectively ruled that state election regulations may restrict the voters' <u>choice</u> of candidates, as long as the states proffered "important regulatory interests."[80]

    *Burdick* robs Plaintiffs' lawsuit of its <u>raison d'etre</u>.  Indeed, limiting a voter to three IRV choices is child's play compared to <u>banning</u> voters outright from voting for certain candidates. What is more, the Minnesota Supreme Court recognized that three-choice IRV promotes a host of "legitimate interests":

> <u>Reducing the costs and inconvenience to voters, candidates, and taxpayers</u> by holding one election, <u>increasing voter turnout</u>, <u>encouraging less divisive campaigns</u>, and <u>fostering greater minority representation</u> in multiple-seat elections are all legitimate interests for the City to foster.[81]

In addition, the Minnesota high court took note of three additional interests that IRV could serve:

> (1) IRV promotes the election of candidates with majority mandates, eliminating plurality winners in one-seat races;
>
> (2) IRV eliminates the "spoiler" effect of third-party candidacies; and
>
> (3) IRV helps insure more diverse representation by promoting minority representation in multiple-seat races.[82]

    Finally, San Francisco had a "legitimate interest" to limit voters to a maximum of three

---

elections).  San Francisco allows voters to rank write-in candidates in its IRV elections.  S.F. CHARTER § 13.102(b), RJN Ex. 12 ("The [IRV] ballot shall in no way interfere with a voter's ability to cast a vote for a write-in candidate.").

[80]    <u>Burdick</u>, 504 U.S. at 428 (<u>quoted by</u> <u>Voters Alliance</u>, 766 N.W.2d at 689).

[81]    <u>Voters Alliance</u>, 766 N.W.2d at 697 (emphases added).  <u>See also</u> <u>McSweeney</u>, 665 N.E.2d at 15 ("Indeed, [multiple-seat IRV], far from seeking to infringe on each citizen's equal franchise, <u>seeks more accurately to reflect voter sentiment</u> and "<u>to provide for the representation of minority groups</u> in the municipal council or to enlarge the possibility of a voter's being represented therein by giving [the voter] an opportunity to express more than one preference among candidates." This purpose is <u>not a derogation from the principle of equality but an attempt to reflect it with more exquisite accuracy</u>") (emphases added) (<u>quoting</u> <u>Moore</u>, 309 Mass. at 324, 331, 35 N.E.2d 222).

[82]    <u>Id.</u>

IRV rankings.  In 2004, when San Francisco implemented IRV, the existing voting equipment could not handle more than three IRV choices.[83]  San Francisco decided to continue using that voting equipment, because the equipment (1) gave voters the chance to correct errors in their first-choice IRV rankings at the polling station, and (2) made it possible for San Francisco to report election-night results for the voters' first-choice IRV rankings.[84]  Both interests – preventing voter disenfranchisement and ensuring timely tabulation and reporting of election results – amply qualify as "legitimate interests" served by three-choice IRV.  Therefore, San Francisco's three-choice IRV did not – and does not – violate <u>any</u> rights protected under the First or Fourteenth Amendments, whether under the Equal Protection Clause or Due Process Clause.[85]

## VII.   Conclusion

       While they are constitutionally entitled to their opinions about IRV, Plaintiffs have brought their case to the wrong forum.  At best, Plaintiffs' fatally flawed lawsuit levies a <u>political</u> argument against IRV – which the voters, and not a court, should decide.  Far from defending any constitutional rights, Plaintiffs' disingenuous agenda becomes readily apparent.  Namely, Plaintiff Dudum and his fellow litigants wish to foist[86] two-round runoff elections on San Francisco – the same, problematic voting system that an absolute majority of voters <u>abolished</u>[87] nearly a decade ago.

---

[83]      At the time IRV was implemented, San Francisco was using the following voting equipment:  Optech Eagles, manufactured by ES&S.  That equipment could not machine-count more than three IRV rankings.  Hill Decl. ¶¶ 5-6.

[84]      <u>See id.</u>

[85]      <u>Burdick</u>, 504 U.S. at 428-29.  Moreover, since Plaintiffs have failed to show that three-choice IRV has disenfranchised <u>any</u> voters, the extensive Due Process Clause jurisprudence invoked by Plaintiffs does not apply to this case.  <u>Contra</u>, Plaintiffs' Moving Papers 17:17-18:27.

[86]      In their Moving Papers, Plaintiffs in effect make San Francisco a settlement offer of "<u>return[ing] to a traditional [two-round] runoff system</u> like that used in the years prior to the adoption of [IRV]".  Plaintiffs' Moving Papers 21:11-21:14 (emphases added).

[87]      "San Francisco Successfully Uses Ranked Choice Voting for Citywide Elections," Nov. 2005, <u>available at</u> http://www.sfrcv.com/ (<u>last visited</u> Feb. 25, 2010).

1    When it unanimously upheld Minneapolis voters' right to adopt and use three-choice IRV,

2  the Minnesota Supreme Court concluded with a keen observation:

3
> Many reasons might be given why this legislation should not have been passed by
4
> the people.  With its wisdom we are not concerned.  <u>The only question is whether
5
> this community had the constitutional right to adopt this plan of election</u>.  The
6
> voters of Minneapolis chose to adopt the IRV method.  We conclude that this
7
> facial challenge to the constitutionality of the IRV method fails.[88]
8

9  In 2002, San Francisco voters exercised their constitutional right to adopt IRV.  A frivolous,

10  "sour grapes" lawsuit should not spoil the fruits of their success.

11                                  Respectfully submitted,

12
    Dated:  February 26, 2010              NEW AMERICA FOUNDATION
13
                                        By:  /s/ Gautam Dutta
14

15                                          GAUTAM DUTTA

16                                          *Attorney for Amicus Curiae,*

17                                          *New America Foundation*

18

19

20

21

22

23

24

25

26

27

28  [88]    <u>Voters Alliance</u>, 766 N.W.2d at 689 (emphases added, citations and quotations omitted).

- 22 -