IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

RON DUDUM, et al.,

        Plaintiffs,
  v.

CITY AND COUNTY OF SAN FRANCISCO, et al.,

        Defendants.
_____/

No. C 10-00504 RS

**ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION**

### I. INTRODUCTION

Does the City and County of San Francisco's restricted instant runoff voting system ("restricted IRV") unreasonably infringe upon voters' rights under the First and Fourteenth Amendments? That is the central question presented in this action. The answer is no.

In the form adopted by San Francisco, the burden restricted IRV imposes on a voter's associational right is not severe; the voting mechanism's effects are not fundamentally unfair. Ron Dudum and various other registered voters in San Francisco seek injunctive relief against the City and County of San Francisco, its Department of Elections ("Department") and Director of Elections, John Arntz, in his official capacity. Those plaintiffs, however, do not demonstrate that the restriction on voter selection to no more than three candidates per ballot is rationally unrelated to the

important governmental interests of minimizing voter confusion and protecting the integrity of the municipal election system. Plaintiffs have not, therefore, demonstrated a likelihood of success on the merits, nor have they shown that the balance of hardships tips in their favor, or that preliminary relief would serve the public interest. Accordingly, based on the briefs submitted by the parties, the hearing on the motion, and the entire record herein, the motion for preliminary injunctive relief must be denied.

## II. FACTS

In March of 2002, the citizens of San Francisco County voted to adopt Proposition A and thereby amend the City Charter. That proposition replaced a two-step municipal election system with instant runoff voting (variously dubbed instant runoff or ranked-choice voting by the parties and abbreviated in the papers, respectively, as "IRV" or "RCV"). Prior to 2002, elections for the Board of Supervisors, Sheriff, Mayor, District Attorney, Public Defender and others were split into a general election and a runoff between the two most successful candidates (at least where no candidate received majority support in the first instance). Defendants highlight myriad failures of the original system as the impetus behind Proposition A. They explain the new system was designed to "address low voter turnout, reduce negative campaigning, lower the cost of elections and make them more efficient." (Defs.' Opp'n Mot. at 1:2-4.) Because any voting system must first undergo rigorous testing and receive approval from the California Secretary of State, defendants explain that San Francisco's first IRV election did not take place until April of 2004.

Proposition A introduced an instant runoff, ranked choice system whereby all voters may rank candidates by order of preference. Defendants explain that the ranking system eliminates the need for a runoff election. Once the polls close, the Department counts all first-choice rankings. If a candidate receives a majority of votes, he or she wins the election. If not, the candidate who received the fewest first-choice rankings is eliminated. Then, the system "instantly" redistributes the second-choice rankings of voters who supported the eliminated candidate. Again, if no candidate achieves a majority, the process repeats.

A handful of other cities in the United States employ instant runoff voting—Cambridge, Massachusetts and Minneapolis, Minnesota by way of example—and, thus far those systems have withstood constitutional challenge. San Francisco has adopted a modified form of IRV whereby voters may rank no more than three choices, regardless of how many candidates have qualified for the ballot.[1]

While Proposition A provides by its terms for unlimited rankings, it also contained this caveat: the Director may limit voters to no more than three choices if the "voting system, vote tabulation system or similar related equipment . . . cannot feasibly accommodate choices equal to the total number of candidates for each office." S.F. Charter § 13.102(b). Defendants cite diverse reasons for the "no more than three" limitation: the voting machines currently in use are not equipped to tabulate accurately unlimited rankings, cost and logistical realities make accommodating the unlimited option untenable, and encouraging voters to rank every candidate in a large field might foment confusion or error. Certainly, *requiring* voters to rank all candidates might also raise constitutional questions. Defendants explain that in 2005 it invited one of its equipment vendors to participate in a pilot program. The vendor tested a four-rank limitation (although the ballots still contained only three columns). Participants were reportedly dissatisfied with the ballot and described it as confusing, difficult to mark, and likely to cause error. In response, the Department opted to limit to no more than three those candidates who could be selected by a voter.

Plaintiffs' constitutional arguments hone in on the following possibility: where more than four candidates run in an election, it is possible that a voter will rank the three least popular candidates. If no candidate receives majority support after three rounds, not only are these voter's

---

[1] The Court granted the motion of New America Foundation to file an amicus brief but without accompanying evidentiary materials. In that amicus brief, the Foundation points out that in the November, 2009 election, the City of Minneapolis also adopted a three choice limitation. Similarly, they assert that the City of Cambridge imposes at least some limit on the number of candidates a voter may rank. Oakland, Berkeley and San Leandro also recently adopted a measure imposing IRV and it appears that these cities, too, plan to restrict voters' rankings to no more than three candidates. Even so, the only courts to have reviewed IRV have all assumed unlimited voter ranking of all candidates. It appears that no court has yet directly considered the constitutionality of *restricted* IRV where the number of candidates exceeds the voter's ranking options.

candidates eliminated, but his or her vote becomes "exhausted." Plaintiffs suggest this means a vote no longer "counts" in the final rounds. Defendants counter that the ranking system is intended to bolster the chances of unpopular candidates, as it supplies voters with more choices than would be possible in the traditional single candidate designation model. Further, they point out that votes already are "exhausted" where a voter chooses to rank fewer than three candidates or makes some other disqualifying error such as the selection of two first choice candidates. Director Arntz estimates that approximately one-quarter to one-third of ballots cast in a typical IRV election in San Francisco list fewer than three preferences. (Arntz Decl. at 4:5-9.) Defendants also point out that ultimately every citizen's vote only "counts" toward one candidate and each vote is tabulated through an identical process.

### III. DISCUSSION

#### A. The Legal Standard

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. N.R.D.C., Inc.*, 129 S. Ct. 365, 374 (2008). Injunctive relief is an "extraordinary remedy" and may only be awarded in response to a firm demonstration that the plaintiff is entitled to such relief. *Id.* at 376 (citation omitted).

#### B. Likelihood of Success on the Merits

Plaintiffs are registered voters of either the city or county of San Francisco. Each plaintiff has stated his or her intent to participate in the November, 2010 municipal elections and, in particular, expressed the intent to vote in an election where vote "exhaustion" is a mathematical possibility. Accordingly, plaintiffs have satisfied the requirements for individual standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

Restricted IRV, according to plaintiffs, is unconstitutional facially and as applied to them. They claim restricted IRV is fundamentally unfair and runs afoul of the Fourteenth Amendment's

substantive due process guarantee. As to their First Amendment and equal protection claims, they contend that San Francisco's restricted IRV system severely burdens the right to vote because it denies some substantial percentage of voters access to final election rounds.[2] In either case, plaintiffs suggest that restricted IRV merits the most exacting scrutiny. They argue defendants must, but cannot, show that the system is narrowly tailored to serve a compelling governmental interest. The validity of each claim and the appropriate standard of review are discussed in turn below.

 1. Substantive Due Process

Plaintiffs argue San Francisco's restricted IRV system implicates substantive due process guarantees. They cite to the Ninth Circuit for the proposition that "an election is a denial of substantive due process if it is conducted in a manner that is fundamentally unfair." *Bennett v. Yoshina*, 140 F.3d 1218, 1226 (9th Cir. 1998). "Only a pervasive error which undermines the 'organic processes' of the ballot is sufficient to trigger constitutional scrutiny." *Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1184 (9th Cir. 1988) (*citing Hennings v. Grafton*, 523 F.2d 861, 864 (7th Cir. 1975)). Plaintiffs allege restricted IRV threatens to disenfranchise a swath of eligible voters because its structure invites the possibility of exhausted votes; it is this "pervasive error," they insist, that makes the system fundamentally unfair. Plaintiffs rely on the same facts and overarching theory to demonstrate the system improperly burdens a voter's ability to participate equally in the franchise. This is unsurprising insofar as an election regulation that systematically denies equal access would surely also interfere with the fundamental right to vote. *See* Tribe,

---

[2] Plaintiffs also ground their claims on 42 U.S.C. § 1983. As these claims are premised on underlying constitutional violations, the section 1983 claims can be analyzed under the same analytical umbrella. *See, e.g.*, *LaRouche v. Fowler*, 152 F.3d 974, 987 (D.C. Cir. 1998) ("[W]e have previously recognized that the case law relating to section 1983 claims, and that relating to claims brought directly under the Constitution, have been assimilated in most . . . respects.") (internal quotation marks omitted). Moreover, the Supreme Court has instructed that, at least in the context of election regulation, courts also may view associational rights claims with equal protection implications through the same analytical lens. *See, e.g.*, *Anderson v. Celebrezze*, 460 U.S. 780, 787 n.7 (1983) (eschewing a separate equal protection analysis and opting instead to analyze election regulation under the auspices of the Court's First and Fourteenth Amendment associational rights discourse).

*Lawrence v. Texas: The Fundamental Right That Dare Not Speak its Name*, 117 Harv. L. Rev. 1893, 1897 (2004) (observing that trying to make sense of the High Court's rulings "rendered in the name of substantive due process . . . reveals . . . a narrative in which due process and equal protection, far from having separate missions and entailing different inquiries, are profoundly interlocked in a legal double helix"). Moreover, the "freedom to engage in association for the advancement of beliefs and ideas is an inseparable aspect of the 'liberty' assured by the Due Process Clause of the Fourteenth Amendment, which embraces freedom of speech." *NAACP v. Alabama*, 357 U.S. 449, 460 (1958).

Plaintiffs' constitutional claims have both equality and liberty implications. Because the Supreme Court has given fulsome guidance in the associational right and equal protection context as to how courts should examine election regulations, it makes sense to employ the analysis suggested there. *See Anderson v. Celebrezze*, 460 U.S, 780, 787 n.7 (1983). As explained below, plaintiffs have not persuasively demonstrated that restricted IRV arbitrarily blocks voter access or weighs votes unequally. It would be analytically inconsistent to rely on an almost identical argument to find restricted IRV fundamentally unfair. To the extent the facts and arguments plaintiffs proffer under each constitutional theory substantially overlap, it also would be duplicative to reiterate the analysis here.

2. First and Fourteenth Amendment Associational Right

The United States Supreme Court long ago observed that "[t]he science of government is the most abstruse of all sciences." *Anderson v. Dunn*, 19 U.S. 204, 226 (1821). "It is a science of experimentation." *Id.* Accordingly, the Constitution does not compel a "fixed method of choosing state or local officers or representatives." *Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 9 (1982). Faced with the arguable limitations of historically familiar methods like "first past the post," "winner-take-all" elections, states and municipalities may experiment with reform and endeavor to craft more efficacious systems. Save and unless a state, county, or municipal government runs afoul of a federally protected right, it has vast leeway in the management of its internal electoral affairs. *Sailors v. Board of Ed. of Kent City*, 387 U.S. 105, 111 (1967). It is not

for a court to comment on the wisdom of electoral reform generally or San Francisco's particular approach in that arena. It is only the system's constitutional effects that are subject to federal judicial scrutiny.

When a state or municipality provides for the election of public officials, "a citizen has a constitutionally protected right to participate . . . on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). In an early statement on election regulations, the Supreme Court explained that because the "right to exercise the franchise in a free and unimpaired manner is preservative of other basic civil and political rights, any alleged infringement of the right of citizens to vote must be carefully and meticulously scrutinized." *Kramer v. Union Free School Dist. No. 15*, 395 U.S. 621, 626 (1969). *See also Wesberry v. Sanders*, 376 U.S. 1, 17 (1964) ("No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live.").

As the Court reasoned in a more recent decision, "[i]t does not follow, however, that the right to vote in any manner and the right to associate for political purposes through the ballot are absolute." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). "Common sense, as well as constitutional law," compels "the conclusion that government must play an active role in structuring elections; as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Id.* (*quoting Storer v. Brown*, 415 U.S. 724, 730 (1974)).

Election regulations of all stripes inevitably burden the individual voter. *Id.* "[T]o subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest . . . would tie the hands of States seeking to assure that elections are operated equitably and efficiently." *Id.* With this observation in mind, the Court in *Burdick* advocated a "flexible" standard for reviewing election regulations. *Id.* at 434. A court must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put

forward by the [government] as justifications for the burden imposed by its rule." *Id.* The strength of the burden controls the rigorousness of the inquiry. *Id.* "[W]hen those rights are subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" *Id.* (*quoting Norman v. Reed*, 502 U.S. 279, 289 (1992)). But when an election regulation imposes only reasonable, nondiscriminatory restrictions, the municipality's important regulatory interests are generally sufficient to justify the restrictions. *Id.*

The Ninth Circuit in *Lemons v. Bradbury*, 538 F.3d 1098 (9th Cir. 2008), elaborated on what makes a burden "severe." The Court observed that the Supreme Court has subjected only two types of voting regulations to strict scrutiny: (1) regulations that "contravene the principle of 'one person, one vote' by diluting the voting power of some qualified voters within the electoral unit"; and (2) regulations that "unreasonably deprive some residents in a geographically defined governmental unit from voting in a unit wide election." *Id.* at 1104 (*citing Green v. City of Tucson*, 340 F.3d 891, 899-900 (9th Cir. 2003)).

     i. <u>Vote Dilution</u>

Plaintiffs argue that even if every qualified citizen may participate in a restricted IRV election, the three-choice cutoff "dilutes" the effectiveness of exhausted votes. *See, e.g.*, *Reynolds v. Sims*, 377 U.S. 533, 555 (1964) ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise."). While the parties do not linger on the issue, it is important to understand just what vote "dilution" means. The concept proceeds from the Supreme Court's "one person, one vote," reapportionment jurisprudence and its meaning is tethered to these philosophical underpinnings.

In the seminal reapportionment case, *Reynolds v. Sims*, for example, the Court held that "the effect of state legislative districting schemes which give the same number of representatives to unequal numbers of constituents" was identical to "a law providing that certain of the State's voters could vote two, five or ten times for their legislative representatives, while voters living elsewhere

could vote only once." 377 U.S. at 562-63. Where an urban individual's vote carried less weight than his rural counterpart, the Court found an obvious and "extraordinary" equal protection violation. *Id. See also Moore v. Ogilvie*, 394 U.S. 814, 818-19 (1969) (striking down statute that made it more difficult for residents of populous counties to nominate Electoral College candidates); *Gary v. Sanders*, 372 U.S. 368, 379-81 (1963) (finding county system improperly weighed rural votes more heavily than urban votes). The Court's reapportionment cases make clear that the "crucial consideration is the right of each qualified voter to participate on an equal footing in the election process." *Wells v. Edwards*, 409 U.S. 1095, 1098 (1973) (*quoting Hadley v. Junior Coll. Dist.*, 397 U.S. 50, 54-55 (1970)).

Defendants insist the three-choice limitation is inherently distinct from *Reynolds*' conception of "dilution":

> RCV elections in San Francisco have only one ballot, voters have only one opportunity to mark their selections, all voter selections are tabulated according to the same rules and procedures, and the Department tabulates and announces final results only once. The RCV tabulation system re-distributes and re-tallies rankings during the tabulation process, often resulting in several rounds of tabulation, but the tabulation process is not when "voting" occurs; no new votes are cast during that process. No voter is allowed to select more choices than any other, and no voter's choices are counted differently than any other's.

(Defs.' Opp'n Mot. at 16-17.) San Francisco's system satisfies the one person, one vote principle: even if voters may rank up to three choices, only one of those choices ultimately "counts." Even where a ballot is exhausted after three rounds, that vote plainly has been "counted." In effect, it is cast for a losing candidate.

The Minnesota and Massachusetts Supreme Courts have also rejected the argument that IRV dilutes votes. *Minn. Voters Alliance v. City of Minneapolis*, 766 N.W.2d 683, 698 (Minn. 2009); *McSweeney v. City of Cambridge*, 422 Mass. 648, 652 (1996). Minnesota's highest court acknowledged that "the Court's one-person, one-vote cases do address the general issue of unequal weighting of votes" but reasoned that "they are inapposite" in the IRV context. *Id.* In

the system reviewed there, of course, voters were able to rank as many candidates as appeared on the ballot. Yet, San Francisco's three-rank limitation does nothing to change the mathematical "weight" of each individual's vote. Imagine an election with five candidates. Four rounds ensue before the winner is revealed. The voter whose first choice candidate ultimately wins uses—and election officials count—a single vote. The voter who ranks the three least popular candidates uses—and election officials count—a single vote (he or she spends it on the losing candidate eliminated last). *See also McSweeney*, 422 Mass. at 652 (rejecting argument that, because voters who prefer *unpopular* candidates are able to exercise a second choice, IRV gives them extra opportunity with the observation that "no ballot can help elect more than one candidate"). Moreover, election officials tabulate every vote and conduct each round in an identical manner. *Cf. Minn. Voters Alliance*, 766 N.W.2d at 698 (distinguishing IRV from the non-uniform standards of vote-counting found constitutionally infirm in *Bush v.* Gore, 531 U.S. 98 (2000)). The concept of vote dilution, where the votes of some voters but not others, mathematically weigh more or less heavily is not an apt fit in the IRV context.

    ii. Unreasonable Deprivation

At least as traditionally understood, "unreasonable deprivation" regulations condition the right to vote in an election on membership in some definable or discreet group. *See, e.g.*, *Dunn v. Blumstein*, 405 U.S. 330, 335-37 (1972) (upending statute that conditioned voter registration on durational residency requirement); *City of Phoenix v. Kolodziejski*, 399 U.S. 204, 209 (1970) (finding unconstitutional state statute conditioning participation in municipal bond vote on property ownership); *Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966) (extending access only to voters who paid poll tax deemed unconstitutional). Plaintiffs suggest San Francisco's system conditions participation in the final round or rounds of runoff voting on a voter's ability to anticipate accurately which candidates will be most successful. Simply put, they argue it systematically denies complete access to voters who favor unpopular candidates. While acknowledging that the Constitution does not require or even prefer electoral systems that

employ runoff voting or select only those candidates garnering majority support, they insist that once a municipality opts to provide a runoff system, it may not exclude otherwise qualified voters from participation therein. The indisputable soundness of this premise notwithstanding, plaintiffs have not shown that restricted IRV actually *does* deny any voter an equal opportunity to participate.

Plaintiffs' theory relies on a specific conception of the system. They argue the best way to think about IRV is as a condensed version of the traditional, two-step runoff mechanism Proposition A replaced. There, the initial and runoff elections constituted two independent events. By ranking all candidates at the same time, IRV is designed to avoid the expense and fluctuating turnout of elections segregated temporally. It even boasts a reduction in negative campaigning between frontrunners. But, each "round" at least mimics an independent electoral event. Defendants counter that restricted IRV is instead more like a single, unitary election: every voter casts one ballot in furtherance of one election at a singular moment in time and each vote counts towards one candidate. According to this view, the system is conceptually more like a single, winner-take-all election. Under defendants' view, IRV's purpose is perhaps broader than under plaintiffs': in addition to eliminating the costs and low turnout associated with runoffs, IRV is more "effective" than a plurality system insofar as it allows for more nuanced voting. Votes are "exhausted" in a theoretically identical manner as are votes cast for losing candidates in a winner-take-all system. That is, even if they do not help elect the winner, they are nonetheless counted.

a. <u>Restricted IRV as Distinct Elections</u>

Plaintiffs' independent election notion is not without support. *See, e.g.*, *Minn. Voters Alliance v. Minneapolis*, 766 N.W.2d 683, 690 (Minn. 2009) (finding methodology of IRV "directly analogous to the pattern of voting in a primary/general election system"). As plaintiffs correctly point out, the Minnesota Supreme Court relied on the similarity of unlimited IRV to a primary and general election scheme when it upheld the voting system. There, plaintiffs argued

that voters whose first choice candidates were eliminated were given a greater opportunity to influence the election. The court reasoned that a vote that is "carried forward" into further rounds continues to affect the election, just as if the vote were re-cast for the favorite in a general election. "Appellants attempt to distinguish the primary / general election system on the basis that that those elections are separate, independent events," the court wrote, "but the effect in terms of the counting of votes is the same." *Id.* at 691.

San Francisco, from what appears even in the Voter Information Pamphlet that accompanied Proposition A,[3] similarly touts the system as at least a simulation of the multi-step runoff method it replaced. Unlike a plurality system, defendants note that under IRV, "[a] winner would still have to receive more than 50% of the vote." (Arntz Decl. Ex. 2.) The key difference between restricted IRV and the two-step scenario, is that in the latter, a voter whose preferred candidate is eliminated after the initial round can always weigh in on those who remain in the runoff. By limiting a voter's choices to just three, plaintiffs argue the "exhausted" votes effectively translate to an "unreasonable" deprivation of the franchise.

For support, plaintiffs rely on the analyses developed by two courts asked to review the effect of a regulation that conditioned a voter's ability to vote in one election on participation in a separate one. Both characterized the burden as severe. *See Ayers-Schaffner v. Distefano*, 37 F.3d 726 (1st Cir. 1994); *Partnoy v. Shelley*, 277 F. Supp. 2d 1064 (S.D. Cal. 2003). In response to defective election results, election officials in *Ayers-Schaffner* attempted to conduct a curative re-vote. To "recreate" the conditions of the first election, the officials attempted to limit participation to only those voters who originally cast ballots. The court found that the condition

---

[3] The Court takes judicial notice of the pamphlet. Under Federal Rule of Evidence 201, "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b). In other words, "the fact must be one that only an unreasonable person would insist on disputing." *Walker v. Woodford*, 454 F. Supp. 2d 1007, 1022 (S.D. Cal. 2006) (*quoting United States v. Jones*, 29 F.3d 1549, 1553 (11th Cir. 1994)) (internal quotation marks omitted). The statements in the pamphlet are certainly capable of accurate and ready determination and no party disputes the pamphlet's accuracy.

warranted strict scrutiny. 37 F.3d at 727. Lack of participation in the original election, the court reasoned, did not suggest complete waiver of voters' interest in the outcome of a curative election. It also dismissed as illusory any attempt to recreate perfectly a first election: identical participation was extremely unlikely as citizens are amply able to move away or lose interest and "[u]nexpected trips and illnesses, or even death, may intervene." *Id.* at 728. Further, the passage of time between the elections played some role, as voter interest and even preferences may change in response to an evolving political and social climate.

In *Partnoy v. Shelley*, the district court found a severe burden to exist where voters were required to weigh in—one way or the other—on whether to recall the sitting governor before election authorities would count a vote cast for a potential successor. 277 F. Supp. 2d at 1069. Moreover, it effectively compelled speech: to participate in the ultimate election, voters who for various reasons wished not to adopt a position on the recall were forced to do so. *Id.* at 1075.

If restricted IRV simulates multiple rounds of elections, plaintiffs argue, the analyses in *Ayers-Schaffner* and *Partnoy* suggest reason to look askance at any regulation that conditions access to a later round on the manner in which a voter participates in an earlier one. Here, a voter's access to final voting rounds is conditioned not just on *whether* that voter participates in a precedent vote, as was the case in *Ayers-Schaffner* and *Partnoy*, but on the candidate selected in the earlier round. Under the system restricted IRV replaced, therefore, it would be constitutionally suspect to exclude from participation in the final runoff all voters who did not choose the two most popular candidates. Even assuming the rest of the voting citizenry disfavored those who remained, they would still be able to express a preference.[4]

On the other hand, nothing in a system restricted to selecting no more than three

---

[4] Plaintiffs' model is less than a perfect conceptual fit. Taken to its logical conclusion, their independent election theory should also entitle voters who did not participate *at all* in the first round to weigh in during the final round. If this were true, even unrestricted IRV should theoretically impose a severe burden. The plaintiffs have not argued this; indeed, it is entirely inconsistent with the thoroughly reasoned analyses of Minnesota's Supreme Court and Massachusetts' Supreme Judicial Court upholding unlimited IRV but arguably follows from plaintiffs' reading of *Ayers-Schaffner* and *Partnoy*.

candidates inherently controls how a voter employs that choice. Restricted IRV does not prevent a voter from carefully casting a vote with the final rounds in mind. Where there are enough candidates to make ballot exhaustion possible, common sense suggests voters might aim to avoid the result by ranking at least one candidate who is likely to survive until the final rounds. The fact that an election scheme may incentivize strategic voting, however, surely does not operate as a severe burden on the franchise. If it did, voters in a plurality scheme who prefer third party candidates but are wary of "wasting" their votes and so vote strategically might all have winning constitutional claims, which they do not. *See, e.g.*, *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 362 (1997) (acknowledging that while "many features of our political system—e.g., single-member districts [and] 'first past the post' elections . . . make it difficult for third parties to succeed in American politics . . . the Constitution does not require States . . . to move to proportional-representation elections"). Moreover, the difficult fact that a vote for an "unpopular" candidate may ultimately be outnumbered by the more numerous votes cast for mainstream competitors cannot by itself constitute a severe burden. The phenomenon is at least to some degree characteristic of any election. It is clear that the Constitution ensures equal access to the franchise; *perfect* access, by contrast, may not be attainable even as a matter of pure political theory. In short, plaintiffs' view of San Francisco's restricted IRV as a series of distinct and separate elections is unpersuasive. As explained below, the better characterization is as a unitary electoral process.

  b. Restricted IRV as a Unitary Election

  Defendants contend that the series of separate elections perspective unfairly mischaracterizes restricted IRV. They insist that the system constitutes, instead, a single electoral event. Even if votes are "tabulated" and "redistributed" in each round, they point out that *voting* takes place only once. Contrary to a series of runoffs separated physically in time, no voter can rethink his or her decision or reflect upon a shifting political landscape. Accordingly, each instant runoff is not independent or separate insofar as voters cannot change course in

response to the character of the winnowing field (in this vein, defendants comfortably distinguish *Ayers-Schaffner*). There is also little indication that a voter's inability to change his or her mind as the field narrows imposes more than a minimal burden.

Defendants further suggest that "exhausted" ballots should be viewed as characterized in *McSweeney v. City of Cambridge*, 665 N.E.2d 11, 14 (Mass. 1996):

> [Exhausted ballots] too are read and counted; they just do not count toward the election of any of the [ultimately] successful candidates. Therefore it is no more accurate to say that these ballots are not counted than to say that the ballot designating a losing candidate in a two-person, winner-take-all race are not counted.

*Id.* As plaintiffs point out, Cambridge employs unlimited IRV. When the Massachusetts Supreme Judicial Court spoke of exhausted votes, it referred to those instances where a voter either chose not to rank all candidates or made an error by, for example, listing two candidates as his or her first choice. Accordingly, the exhausted vote problem in that instance did not pose the same possible dilemma as present here. In Cambridge, voters who chose not to rank all candidates, in a sense, opted out of the chance to participate in all possible rounds. Even so, the court's logic still applies to restricted IRV: the exhausted votes were not arbitrarily thrown out or ignored but rather were cast for losing candidates. A vote for a losing candidate is simply not the same as voter disenfranchisement.

Defendants' final point draws a comparison between restricted IRV and the burden recognized as less than severe in *Burdick v. Takushi*, 504 U.S. 428 (1992). The *Burdick* Court held that a Hawaii prohibition on write-in voting did not severely burden the franchise. Accordingly, the Court employed rational basis review. At first blush, a complete write-in ban seems to levy a heavier burden on associational rights than a three-choice limitation. Relying on the ease with which a candidate may appear on a ballot in Hawaii, the Court reasoned that, in effect, "any burden on voters' freedom of choice and association is borne only by those who fail to identify their candidate of choice until days before the primary." *Id.* at 436-37. The Court

also noted that the petitioner, at bottom, "claims he is entitled to cast and Hawaii required to count a 'protest vote' for Donald Duck . . . ." *Id.* at 438. But, "the function of the election process is to winnow out and finally reject all but the chosen candidates, not to provide a means of giving vent to short-range political goals, pique, or personal quarrel[s]." *Id.* (*quoting Storer*, 415 U.S. at 735) (internal quotation marks omitted; alteration in original). Consequently, the write-in prohibition did not in purpose or effect impose a severe burden. Here, there is also an obvious way voters can avoid exhaustion. If they have a strong opinion for or against a likely frontrunner, they may target their ranking options accordingly.

Defendants suggest that, if anything, restricted IRV is a truer method for reflecting the expressive choice of each citizen than alternative models. As *McSweeney* characterized IRV, albeit in its unrestricted form:

> [A] preferential scheme, far from seeking to infringe on each citizen's equal franchise, seeks more accurately to reflect voter sentiment and to provide for the representation of minority groups in the municipal council or to enlarge the possibility of a voter's being represented therein by giving [the voter] an opportunity to express more than one preference among candidates. This purpose is not a derogation from the principle of equality but an attempt to reflect it with more exquisite accuracy.

422 Mass. at 654 (internal citation and quotation marks omitted) (alteration in original).

Of course, even perfectly laudable intentions cannot excuse improper effects. The burden here, however, is not severe and does not merit heightened scrutiny. Proposition A was designed to replace a two-step, majority-based runoff system. It did so by implementing IRV. Due to resource constraints and with an eye toward accessible and straightforward ballots, the Board of Elections has imposed the three-rank limitation. Even in large elections where the effect is to block some percentage of voters from ranking candidates that appear in the final, dispositive rounds of municipal elections, nothing in the limitation unreasonably differentiates between or automatically cabins-off voters. Even if the opportunity for unfettered strategic voting is in a sense hampered, nothing in the limit on the number of candidates to be selected controls the way

a voter exercises his or her preferences or forces that voter to adopt unpalatable positions on candidates.

      iii. <u>Reasonable Relation to Important Governmental Interests</u>

Having determined that rational basis review attaches to San Francisco's election method, the question then becomes whether that electoral system is structured to serve important governmental interests. Defendants contend that restricted IRV does indeed respond to "interests related to orderly administration of justice." (Defs.' Opp'n Mot. at 15:16-17.) More immediately, they contend that offering an unlimited number of choices in each election is not technologically feasible. Apparently, San Francisco's current voting machines are not designed to read more than three ranking columns. They add that, even assuming adequate technology exists (as it surely must, if the cities of Minneapolis and Cambridge presumably conducted unlimited IRV elections at some point), any new voting system must first survive a rigorous and lengthy public examination process and obtain approval from the California Secretary of State. More persuasively, they point out that the three-choice limitation avoids the sort of confusion that might attach were a voter asked to rank ten or even twenty candidates. Related to this point, they argue it also reduces the likelihood of tabulation or voter error.

In order to use San Francisco's existing voting machines, defendants envision a system whereby voters must fill out multiple ballot cards. They then list a minor parade of horribles: the physical separation of these cards is infinitely possible (in the machines' storage bins, in transportation, or at the polling location if and when a machine rejects a ballot card due to error) and dangerous (it might confuse any record of the voter's choice and jeopardize the accuracy of a recount); printing and storing sufficient paper ballots would be wasteful, voluminous and expensive; the Department would need to hire more staff and rent more storage space. On the other hand, defendants lament that a single ballot card vast enough to handle the largest San Francisco election held since 2004 (that is, large enough to include space for twenty-two candidates as well as write-ins), would "require either an eight-foot-long ballot with twenty-three columns or a massive 23-by-

23 matrix with 529 bubble choices for each voter." (Defs.' Opp'n Mot. at 17-18.) Apparently, state, federal and local regulations impose detailed font and typeface requirements, insist that all text appear in three languages, and mandate sufficient space for write-in candidates. As a result, defendants predict an unrestricted IRV ballot would be seven times the length of its restricted counterpart and, at least for San Francisco's current technology, unreadable.

Either of those other alternatives would seem to undermine the City's interest in an orderly, accurate election process. A single ballot card alleviates the risk that separated ballots might result in error but would also foist a potentially confusing and burdensome amount of information on voters. *Cf. Rubin v. City of Santa Monica*, 308 F.3d 1008, 1017 (9th Cir. 2002) (recognizing "legitimate goal of achieving a straightforward, neutral, non-confusing ballot"). A three-choice limitation that applies to all voters, then, seems at least reasonably related to these important and legitimate governmental interests.[5]

---

[5] Because plaintiffs have not demonstrated likelihood of success on the merits, the Court does not address the arguments they advance to satisfy the remainder of the *Winter* preliminary injunction standard. The Supreme Court in *Winter* rejected the Ninth Circuit's "sliding scale" approach to preliminary injunctive relief. The Ninth Circuit had previously reasoned that a preliminary injunction inquiry required a court to balance plaintiff's likelihood of success on the merits against the relative hardship to the parties. The Ninth Circuit saw the balance as a "continuum," where "the required showing of irreparable harm varies inversely with the probability of success." *LGS Architects, Inc. v. Concordia Homes*, 424 F.3d 1150, 1155 (9th Cir. 2005). Consequently, where a plaintiff demonstrated a "strong showing of irreparable harm and a sharp tipping of the balance of hardships" and, if not a "likelihood" of success, at least "serious questions" going to the merits, the sliding scale approach allowed for preliminary injunctive relief. *McDermont v. Ampersand Pub., LLC*, 593 F.3d 950, 965 (2010) (describing Ninth Circuit's pre-*Winter* approach). Plaintiffs, citing *Elrod v. Burns*, 477 U.S. 347, 373 (1976), for the proposition that the loss of First Amendment freedoms "unquestionably constitutes irreparable injury," suggested in their motion that the Court should adopt the continuum approach and search only for serious questions going to the merits. Plaintiffs' request would require a reading that distorts *Winter*. In *Winter*, the Court expressly rejected at least one half of the conceptual continuum: it insisted a plaintiff must *always* show a strong likelihood of irreparable harm. In *American Trucking Association v. City of Los Angeles*, the Ninth Circuit acknowledged that *Winter* rejected the Ninth Circuit's preliminary injunction standard as "too lenient." 559 F.3d 1046, 1052 (9th Cir. 2009). The Ninth Circuit then recited *Winter*'s standard (which speaks only of a "likelihood" of success) and insisted that, "[t]o the extent that our cases have suggested a lesser standard, they are no longer controlling, or even viable." *Id. See also McDermont*, 593 F.3d at 965 (noting where district court erroneously applied the pre-*Winter*

## IV. CONCLUSION

A preliminary injunction is an extraordinary remedy courts may not lightly grant. Plaintiffs have not persuasively shown that San Francisco's restricted IRV voting method works an unreasonable deprivation of the franchise. While the three-rank limitation does exert some burden on voting rights, it is not severe. Defendants, for their part, have adequately introduced important government interests that are well-served by the limitation. Accordingly, plaintiffs have not demonstrated a likelihood of success on the merits. Where the imposition of an injunction just months before the election would potentially—and, needlessly—send San Francisco's municipal election system into tumult, it would be improvident to grant such relief. The plaintiffs' motion for preliminary injunctive relief therefore must be denied.

IT IS SO ORDERED.

Dated: 04/16/2010

RICHARD SEEBORG
UNITED STATES DISTRICT JUDGE

---

standard, that "serious" questions going to the merits "would not be enough to support the entry of a preliminary injunction, regardless of the other factors"). Accordingly, a demonstration of a likelihood of success on the merits is necessary to the award of preliminary injunctive relief. Plaintiffs have not satisfied their burden here and therefore the remaining elements for preliminary injunctive relief need not be addressed.